UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH ANTLITZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 8135 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| FOREST PRESERVE DISTRICT | ) | |
| OF COOK COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Deborah Antlitz sued her employer, the Forest Preserve District of Cook County, alleging sex discrimination (Count 1) and retaliation (Count 2) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as retaliation under the Illinois Whistleblower Act (Count 3), 740 ILCS 174/1 *et seq.*, and the Cook County Inspector General Ordinance (Count 4), Cook County Code Ch. 2, Art. IV, Div. 5, § 2-291.[1] The District moves for summary judgment on all claims. R. 34,[2] Def.'s Mot. Summ. J. For the reasons stated below, the District's motion is granted as to the sex-discrimination claim, but denied as to the retaliation claims.

## I. Background

In deciding the District's motion for summary judgment, the Court views the evidence in the light most favorable to Antlitz. *Matsushita Elec. Indus. Co. v. Zenith*

---

[1]The Court has federal question jurisdiction over this case under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).
[2]Citations to the record are noted as "R." followed by the docket number.

*Radio Corp.*, 475 U.S. 574, 587 (1986). The facts narrated here are undisputed unless otherwise noted.

Antlitz has been working as an Ecologist for the District since August 1999. R. 35-1, DSOF ¶ 2;[3] R. 35-3, DSOF, Exh. B at 6:13-21. In 2003, the District promoted Antlitz to the position of Ecologist II. DSOF ¶ 3; DSOF, Exh. B at 7:5-7. In October 2011, after her boss retired, she was named Interim Chief Ecologist (or Ecologist III). R. 37, Pl.'s Resp. DSOF ¶ 3; R. 38-2, PSOF, Exh. A at 219:20-220:1; *see also* DSOF, Exh. B at 25:17-22. Her title returned to that of Ecologist II when Charles O'Leary was hired in 2012 as an Ecologist III. Pl.'s Resp. DSOF ¶ 3; R. 38-3, PSOF, Exh. B at 44:1-6. Until 2012, Antlitz's employee record contained no disciplinary actions. R. 38, PSOF ¶ 1; PSOF, Exh. A at 130:16-131:3.

When Charles O'Leary was hired as an Ecologist III in 2012, he became Antlitz's direct supervisor. *See, e.g.*, R. 35-4, DSOF, Exh. C at 1-6. In 2015, he was promoted to Deputy Director of Resource Management, but he still kept his role as Antlitz's direct supervisor. *See, e.g.*, R. 38-6, PSOF, Exh. E at 7-16. The other relevant person in the supervisory chain of command is John McCabe, who became the Director of Resource Management in 2014; before that, he held the position of Deputy

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the District's Statement of Facts [R. 35-1], "PSOF" for Antlitz's Statement of Facts [R. 38], "Pl.'s Resp. DSOF" for Antlitz's response to the District's Statement of Facts [R. 37], and "Def.'s Resp. PSOF" for the District's response to Antlitz's Statement of Facts [R. 40]. At times, this Opinion will cite pages of an exhibit, which is attached to an exhibit to one of the parties' Statement of Facts; where possible, the citation will include the specific bates stamp for ease of reference (for example, DSOF, Exh. B at Exh. 8 (FPD00497)).

Director. *See* DSOF ¶¶ 5-6; R. 35-5, DSOF, Exh. D at 8:12-25; R. 38-4, PSOF, Exh. C at Exh. 11.

## A. Disciplinary History

In November 2012, the District disciplined Antlitz for her work performance earlier that year. DSOF, Exh. B at Exh. 8 (FPD00497). Specifically, the District accused Antlitz of "display[ing] inappropriate, unprofessional behavior while working with a hired contractor which led to work being shut down and additional costs being incurred … ." *Id.* The contractor reported that Antlitz "inappropriately questioned his Project Foreman, making threatening statements in regard to a different project and made disparaging remarks directed toward other District staff involved in that project." *Id.*

A pre-disciplinary hearing took place on November 7, 2012, and attendees included Antlitz, her attorney Tim Johnson, Chris Merenowicz (Director of Resource Management), John McCabe (then the Deputy Director of Resource Management), Charles O'Leary (Resource Ecologist III), Keino Robinson (Senior Attorney), and Michelle Gage (Director of Human Resources). DSOF, Exh. B at Exh. 8 (FPD000495-96). Antlitz was ultimately suspended for three days, beginning on November 26, 2012, for violating four Cook County Rules of Conduct.[4] *Id.*

---

[4]The rules that Antlitz allegedly violated are: 8.03(b)(3) – Fighting or disruptive behavior; 8.03(b)(9) – Negligence in performance of duties; 8.03(c)(2) – Failure to follow instructors or work in accordance with County policies, procedures, or practices; and 8.03(c)(4) – Performing at less than a satisfactory level in any job classification. DSOF, Exh. B at Exh. 8 (FPD000495).

On October 18, 2013,[5] Antlitz filed a Charge of Discrimination against the District with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission (EEOC), alleging that her three-day suspension in November 2012 was an act of retaliation by the District after she reported alleged sex discrimination to the Human Resources Manager. PSOF ¶ 3; R. 38-14, PSOF, Exh. N (EAB 480). Antlitz had reported "an ongoing pattern of [sex] discrimination by John Raudenbush" to Human Resources on September 14 and 24, 2012. PSOF, Exh. N (EAB 481). The District became aware of the charge around November 14, 2013. PSOF ¶ 3; PSOF, Exh. N (EAB 478).

### B. Schaumburg Grasslands Management Plan

In 2015, one of Antlitz's responsibilities was to write a management plan for the Schaumburg Grasslands. *See, e.g.*, DSOF ¶ 13. In late January 2015, Antlitz emailed the Illinois Department of Natural Resources (referred to in exhibits and depositions by the acronym "IDNR") about the Schaumburg Grassland plan, asking for a "professional opinion on some proposed management activities as they relate to the state-endangered black-cuckoo." PSOF, Exh. E at Exh 8 (FPD001791). In a February 2 email, IDNR Impact Assessment Section employee Keith Shank responded that, under Illinois law, a local unit of government undertaking the "clearing operations" Antlitz described would be required to consult the IDNR,

---

[5]There is a minor discrepancy in the record as to when Antlitz filed this charge. There are multiple references to May 2013 as the date of the charge. *See, e.g.*, R. 10, Am. Compl., Exh. 1. Nevertheless, because the actual charge is dated October 18, 2013, R. 38-14, PSOF, Exh. N, and the parties both admit to that date in their Statements of Fact, PSOF ¶ 3; R. 40, Def.'s Resp. PSOF ¶ 3, the Court will use that date for the purposes of this Opinion.

because that would constitute a plan to "alter environmental characteristics of the land, air, or water … ." *Id.* at Exh 8 (FPD001789-90). Antlitz replied, in part, that "[i]t would be a very good thing if an authority at the IDNR would approach the FPD leadership and make this legal obligation clear." *Id.* at Exh. 8 (FPD001788).

On April 8, 2015, Antlitz sent an email to O'Leary, copying McCabe, and requested a "copy of the consultation or incidental take authorization" for the Schaumberg Grassland plan, as proof of compliance with the Endangered Species Act. PSOF, Exh. E at Exh. 7. If that consultation did not take place, she wrote, "there is a violation to be reported to the state." *Id.* A few days later, Antlitz forwarded O'Leary and McCabe her communications with the IDNR, stating that the draft management plan "would require consultation process with them before approval." *Id.* at Exh. 8 (FPD001788). In response, O'Leary instructed Antlitz to obtain his approval prior to contacting outside agencies. *Id.* Sometime in April 2015—although unclear exactly when—Antlitz filed an online complaint with the IDNR, alleging that the District violated the Endangered Species Act by destroying the habitat of the black-billed cuckoo. *See* DSOF ¶ 14; PSOF, Exh. B (FPD001780-81). Antlitz also informed O'Leary of this complaint that same month. DSOF ¶ 15; DSOF, Exh. B at 230:9-12.

At some point in 2015, Antlitz also reported to the Office of the Independent Inspector General of Cook County (call it the "OIG" for short) that the District was violating the Illinois Endangered Species Act. *See* DSOF ¶ 16; PSOF, Exh. B (FPD001780-81). On July 29, 2015, Antlitz emailed Lorraine Ambriz, an investigator

at the OIG, to level an accusation against O'Leary: "Attached is an e-mail I sent to Charles O'Leary as a follow-up to our May 20 meeting, when he expressed intent to ignore the endangered species act and re-draft the schedule." PSOF, Exh. E at Exh. 9. In the May 20 email to O'Leary, Antlitz asked him, in part, to "[p]lease consider including the recommended updates we talked about[.]" *Id.* She also urged him to take responsibility of what she believed to be an objectionable project: "You will add your name to this to clarify that you are assuming liability for this management schedule. Until we definitely address the consultation requirements and endangered species concerns with the IDNR, I am not endorsing a schedule which may be construed as a violation of the endangered species act." *Id.*

Later that year, on November 13, 2015, OIG Investigator Ambriz informed Antlitz that the OIG "received information … that your superiors and/or RM management has been more receptive to the site management plans you or other Ecologists presented; particularly for the black-billed cuckoo; and have changed the plan back to the one you revised to accommodate conservation plans for the black-billed cuckoo; and that management has approved the new, updated plan." PSOF, Exh. B (FPD001781). The investigator asked for updates: "I recall you told us that FM Director Charles O'Leary … scrapped your revised plan, deleting your black-billed cuckoo considerations, and signed/approved the one he wanted to be utilized. Let us know if anything has improved, changed, or if there are any updates … ." *Id.* In her response on November 18, 2015, Antlitz reiterated that there "is still … evident lack of regard for the state laws of endangered species, [and] their refusal to

participate in the required consultation process with IDNR." *Id.* (FPD001780-81).

Although the exhibit provided is cut off, it appears that Antlitz sent another email in which she purported to quote O'Leary's reaction to her complaint: "'I take it this means you have made a complaint. I am really sorry to see you going that route…' He pretty much got angry and silent and walked out without attempting to clarify what the true situation was as to the endangered species and management plan for Schaumburg grasslands. I felt very threatened by his tone of voice, body language, lack of eye contact, and words. … Supervisor Charles O'Leary evidently did not get the message from whoever you spoke with at FPD." *Id.* (FPD001780).

### C. Bluff Spring Fen Management Plan

In 2015, Antlitz was also working on the site management plan for the Bluff Spring Fen Nature Preserve. DSOF ¶ 24; DSOF, Exh. B at 81:22-82:2. To get things going, in September 2015, Antlitz sent an email to various District partners (and copying O'Leary and Raquel Garcia-Alvarez, another District employee), attaching a draft management plan, requesting input, and suggesting a meeting in October. PSOF, Exh. E at Exh. 10. Skipping forward, in December 2015, Antlitz followed up with a "nearly finalized Bluff Spring Fen Nature Preserve Plan" to O'Leary and District partners. *Id.* at Exh. 13. The partners on this particular email were: Steve Byers, a representative of the Illinois Nature Preserve Commission who had authority to approve the plan; Leon Halloran, a volunteer steward and one of the plan signatories; and Doug Taron, a butterfly expert and the President of Friends of Bluff Spring Fen. *See id.*; PSOF, Exh. A at 163:12-24, 171:21-172:13; PSOF, Exh. E at

340:13-17. Byers responded, "I will take a look at this next week. I appreciate that you also copied Leon and Doug." *Id.* O'Leary also responded to the whole group, saying "I will also want to review again. Will send on any comments." PSOF, Exh. E at Exh. 13.

In mid-January 2016, O'Leary sent an email to *only* Antlitz, attaching the plan annotated with his comments. PSOF, Exh. E at Exh. 15. Leading up to that email (from mid-September into December 2015), there had been multiple emails back and forth with the entire group, and never did O'Leary instruct Ms. Antlitz *not* to copy other people.[6] *Id.* at 337:10-22; *see also* PSOF, Exh. E at Exhs. 11-14. After O'Leary sent his comments on the plan to Antlitz only, Antlitz responded—but included others on the response. Specifically, on January 19, 2016, Antlitz emailed O'Leary, Byers, Taron, and Halloran the plan with O'Leary's comments and her responses, noting that "[s]ome of them would benefit from discussion and expert input … with our longstanding collaborative team." PSOF, Exh. E at Exh. 16. In the text of the email, Antlitz directed several questions concerning O'Leary's comments to Taron, Halloran, and Byers. *Id.*

Most of O'Leary's 14 comments on the Bluff Spring draft plan were actually questions seeking input. PSOF, Exh. E at Exh. 16. As for the rest, Antlitz

---

[6]The District argues that "O'Leary had previously emailed Antlitz specifically directing her not to forward correspondence to outside parties." DSOF ¶ 29. The District cites to O'Leary's testimony during the administrative hearing, which in turn refers to an exhibit that purportedly shows this instruction. DSOF, Exh. E at 51:7-24. Although O'Leary testified that his email conveyed to Antlitz that he was not happy with her forwarding documents to outside parties, *id.* at 51:7-11, Antlitz denies that this is what the document says, Pl.'s Resp. DSOF ¶ 29. Because neither party provided the actual exhibit, this fact remains in dispute.

incorporated several of O'Leary's comments into the revised plan, *see, e.g.*, *id.* at Comment #CH019, but she also disagreed or pushed back on others, *see, e.g.*, *id.* at Comment #CHO13. Worth noting is one of Antlitz's responses, which later prompted an accusation against her for disparaging District staff. *See* PSOF, Exh. C at Exh. 11 (FPD000012). O'Leary asked Antlitz to remove the first part of the following sentence: "Since the 2012 drought followed by a site-wide prescription burn at the behest of the forest preserve's wildlife department staff, the eyed brown butterfly has been seen only at low and sporadic numbers … ." PSOF, Exh. E at Exh 16 (Comment #CH09). O'Leary wrote that "the relationship is speculative"—that is, the relationship between the burn and the low sightings of the butterfly. *Id.* Antlitz responded, "The sentence does not state definitive causality, but the risk of drought and burning on these butterflies is not 'speculation' … The FPCC should stand in accountability to INPC for these actions that violated the standing nature preserve plan at the time. The ramifications … in light of better science being ignored is serious." *Id.* Antlitz then referenced the OIG's 2012 Third Quarterly Report (the OIG Report), which is a public document. *See id.*; Pl.'s Resp. DSOF ¶ 61; PSOF, Exh. B (FPD000115). The paragraph that Antlitz cited discusses the OIG's finding that an unnamed Wildlife Biologist II employee did not meet the minimum qualifications of the position, particularly those necessary for job positions that are scientific in nature. PSOF, Exh. B (FPD000115).

On January 21, 2016, Doug Taron (the butterfly expert who does not work for the District) responded to Antlitz's various questions and thanked her "for putting

together such a strong document." PSOF, Exh. E at Exh. 17. That same day, O'Leary also responded to the group, specifically to Taron's comments as well as to some of Antlitz's. *Id.* at Exh. 18. O'Leary ended the email by noting that he was holding off on approving the plan: "Looking at some of the other comments in the text, I am not comfortable signing off on the schedule as it reads now. I'll take a closer look at this document and we can have further discussion." *Id.* There is no evidence that O'Leary informed Antlitz of the potential disciplinary ramifications of sharing his comments with the wider group at any point before February 4, 2016, when he issued her a Disciplinary Action Form. *Cf.* DSOF, Exh. C at Exh. 25.

### D. Busse South Shoreline Restoration Project

At the end of November 2015, Antlitz requested winter work to be conducted for the Busse South Shoreline Restoration Project. PSOF ¶ 19; R. 38-7, PSOF, Exh. F at 20:13-21:16, Exh. 1 (FPD000030). In early December 2015, Troy Showerman, the Project Manager, *see* R. 35-7, DSOF, Exh. F at 4, responded to Antlitz's request with comments and questions for clarification, and also suggested that there was no need to protect ash trees: "I honestly see no reason to protect ash. I will not include as a target which should protect the majority of them by default." *Id.* at Exh. 1 (FPD000029-30). But Antlitz responded that the "ash to be protected at this point is a stand of very tiny saplings" and expressed a preference "that mention of the intent to protect ash in that unit were clearly stated … ." *Id.* at Exh. 1 (FPD000029). Showerman replied that this was fine. *Id.* O'Leary was copied on these

communications, *see, e.g., id.*, and the final work order specifically read: "Avoid treatment of ash sapling/seedling[,]" *id.* at Exh. 4.

The next month, in mid-January 2016, Assistant Resource Project Manager Brenda Occhuizzo arranged for Antlitz to go to the Busse South site and meet with the contractor about the ongoing work. PSOF ¶ 20; R. 38-16, PSOF, Exh. P at Exh. 4. It is undisputed that, "while meeting with the contractor, Antlitz discussed the most pragmatic way of protecting the ash seedlings from destruction and suggested hand tools." PSOF ¶ 20; PSOF, Exh. F at Exh. 3. The next day, on January 14, Showerman informed Antlitz that he did not approve the contractor's request for hand-cutting around the ash, stating that the description to "avoid ash seedlings" was fine, and attached an estimate of the contractor's work. PSOF, Exh. F at Exh. 3. Antlitz appeared to caution against mowing all the ash seedlings down, but ultimately responded that "[i]f he is asking to up the price a lot, that's understandable … ." *Id.*

Around one week later, on January 22, 2016, Antlitz visited the Busse South Shoreline site again. The contractor asked her for clarification on the removal of standing dead ash near a wetland. PSOF ¶ 23; PSOF, Exh. E at Exh. 22. Antlitz responded that because this was not part of the work order, the contractor would have to speak with contract management. *Id.* That same day, the contractor, John Shannon, emailed Showerman and Occhiuzzo to report that "Debbie wasn't really happy about thinning any of the elm and wasn't thrilled we were cutting some of the ash trees out." PSOF, Exh. E at Exh. 21 (EAB 460). He added that "it can be tuff[sic]

on the crew when an ecologist comes out and is consistently unhappy with things[,] and that "these mixed messages put a damper on the work … ." *Id.* (EAB 461).

A few days later, on January 27, Showerman responded to Shannon that "the final decision making on this project should come from Brenda or I[,]" and that "[t]he department overall does not agree with Debbie's assessment of how to deal with what is left of the ash population know[sic] that EAB has decimated everything." PSOF, Exh. E at Exh. 21 (EAB 460). Later that day, O'Leary informed Antlitz that the Busse contractor asked for clarification on the work order, and asked her to reach out to Showerman if she had any concerns so that Showerman could provide contractors with instructions. PSOF, Exh. E at Exh. 22 (EAB464). When Antlitz asked what the clarification was about, O'Leary did not respond. *Id.* (EAB 463). After following up with Showerman, Antlitz sent an email on January 29 to O'Leary reporting on the contractor's question: "According to Troy, the contractor asked for clarification on the removal of standing dead ash near a wetland. This was an item not on the original work order, which the contractor brought up and recommended doing when I was out there. I pointed out to the contractor it was not part of the work order, but to talk to Contract Management about the suggestion. … Generally for any adjustments both Ecology and Contract Management should be in agreement. They take their instructions from Contract Management, as per their contract." *Id.*

### E. January 2016 Performance Evaluation

Antlitz had her annual review with O'Leary on January 25, 2016, covering the period of January 1, 2015 to December 31, 2015. DSOF ¶ 18; DSOF, Exh. C at Exh. 23. O'Leary gave Antlitz a rating of 2 out of 4 for teamwork, and his comments included this criticism: "In 2015, Debbie contacted outside agencies and groups to oppose decisions made by district staff. This has resulted in a lot of unnecessary work for staff and in some cases, damaged the district's reputation." PSOF ¶ 4; R. 38-15, PSOF, Exh. O (EAB 468). Her overall performance evaluation rating was 2.8 out of 4, translating to "Meets Some Requirements." PSOF, Exh. O (EAB 469). At the end of that meeting, Antlitz gave O'Leary a copy of the November 13, 2015 email that Antlitz had received from Ambriz (the OIG investigator), which mentioned O'Leary's name in connection with an OIG investigation. DSOF ¶ 19; DSOF, Exh. B at 227:1-12; DSOF, Exh C. at Exh. 24.

The parties dispute why Antlitz gave O'Leary the OIG email. *See* R. 40, Def.'s Resp. PSOF ¶ 5. Antlitz testified that she was asking for clarification about the status of the Schaumburg Grassland schedule. Pl.'s Resp. DSOF ¶ 19; PSOF, Exh. B at 226:2-9. Earlier in the performance-evaluation meeting, she had asked about the plan because she thought that a change had been made (as implied in the OIG email). *See* Pl.'s Resp. DSOF ¶ 19; PSOF, Exh. B at 253:8-254:12. But after O'Leary said that he did not know of any changes, Antlitz showed him the email "to show documentation that someone is saying there has been a change in the plan which would have been a positive change … ." PSOF, Exh. B at 254:6-12. In contrast, O'Leary later testified at the Employee Appeals Board hearing that he "knew that it was intended to

intimidate [him] … ." R. 35-6, DSOF, Exh. E at 30:9-21. Antlitz disputes that O'Leary was intimidated. Pl.'s Resp. DSOF ¶ 19. She testified that, after she gave O'Leary the email, he said: "I take it this means you filed a complaint against me. I'm really sorry to see you go this way. This is like the little lawsuit you have going." PSOF, Exh. B at 238:4-21.

Less than two weeks later, on February 4, 2016, Antlitz received a notice signed by Resource Management Director McCabe; the notice informed Antlitz of an upcoming pre-disciplinary hearing to address Antlitz's potential violations of various Cook County Personnel Rules. DSOF ¶ 21; DSOF, Exh. C at Exh. 25 (EAB 421). Antlitz also received a Disciplinary Action Form from O'Leary, which briefly described the three incidents forming the basis of the disciplinary action: (1) Antlitz shared O'Leary's Bluff Spring comments via a group-wide email on January 19, 2016; (2) Antlitz interfered with the Busse South contractor's work on January 22, 2016; and (3) Antlitz showed O'Leary the OIG email on January 25, 2016. DSOF ¶ 23; DSOF, Exh. B at Exh. 3 (EAB 423-24). The pre-disciplinary hearing was held on February 22, 2016. PSOF, Exh. C at Exh. 11 (FPD000011). Attendees included Antlitz, her attorney Amy Cramer, McCabe, O'Leary, and Robinson. *Id.* As a result of the pre-disciplinary hearing, Antlitz was fired by McCabe on March 28, 2016. *Id.*

### F. Administrative History

In July 2016, Antlitz filed a charge against the District with the IDHR and the EEOC. DSOF ¶ 12; R. 10, Am. Compl., Exh. 1. Antlitz also appealed her firing to the Cook County Employee Appeals Board, which held a hearing in August 2016. *See*

DSOF ¶ 31; PSOF, Exh. A (EAB 75). In early October 2016, Administrative Law Judge Joanne Kinoy found that the District did not have good cause to fire Antlitz and recommended that Antlitz be reinstated to her former position, subject to a 29-day suspension for sending the draft of the Bluff Spring Fen management plan with O'Leary's comments to outside parties. DSOF ¶ 31; DSOF, Exh. F at 10, 12-13. The full Appeals Board adopted the ALJ's recommendation. DSOF ¶ 33; R. 38-5, PSOF, Exh. D. Both the District and Antlitz further appealed the Appeals Board's decision to the Circuit Court of Cook County. *See* R. 38-12, PSOF, Exh. K. In August 2017, the EEOC issued Antlitz a right to sue letter. DSOF ¶ 12; Am. Compl., Exh. 2. Antlitz filed this case in November 2017.

In January 2018, the Circuit Court of Cook County affirmed Antlitz's reinstatement, reversed the imposition of the 29-day suspension, and remanded the case back to the Appeals Board for a lesser discipline. R. 38-11, PSOF, Exh. J; *see* DSOF ¶ 34. Specifically, the state court found that progressive discipline should have been applied, because Antlitz had never been formally disciplined for disclosing information to outside parties. PSOF, Exh. J at 4. On remand, the Appeals Board reduced the suspension to 15 days, finding that the District was entitled to depart from progressive discipline in this case. R. 35-8, DSOF, Exh. G at 7-8.

## II. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Sex Discrimination (Count 1)

Antlitz first alleges that the District discriminated against her on account of her sex in violation of Title VII. Am. Compl. at ¶¶ 48-51. To survive summary judgment on this claim, Antlitz must produce evidence that would allow a reasonable

jury to find that the District's adverse employment actions against her were motivated by her sex. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("The legal standard … is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."). Although the Seventh Circuit no longer distinguishes between "direct" and "indirect" evidence when analyzing employment discrimination claims, *id.* at 765-66, the *prima facie* framework under *McDonnell Douglas* remains intact. This is a flexible framework and should "be adapted to fit the varying facts of discrimination cases." *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999).

In arguing against summary judgment, Antlitz appears to rely solely on the *McDonnell Douglas* framework. *See generally* R. 36, Pl.'s Resp. Br. To establish a *prima facie* case of discrimination, Antlitz must show that (1) she is a member of a protected class; (2) her job performance met the District's legitimate expectations; (3) she suffered an adverse employment action; and (4) the District treated another similarly situated employee who was not a member of the protected class more favorably.[7] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *LaRiviere v. Board of Trustees of Southern Ill. Univ.*, 926 F.3d 356, 360 (7th Cir. 2019). If Antlitz

---

[7]It is undisputed that Antlitz is a member of a protected class (female) and that she suffered an adverse employment action when she was fired. *See, e.g.*, Def.'s Mot. Summ. J. at 6; R. 39, Def.'s Reply at 3. Antlitz also contends, however, that the February 4, 2016 Disciplinary Action Form qualifies as an adverse employment action. The Court disagrees. There is no evidence that, in and of itself, the Disciplinary Action Form effected a quantitative or qualitative change that altered the terms or conditions of Antlitz's employment. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003).

is able to establish a *prima facie* case, then the burden will shift to the District to provide a legitimate, nondiscriminatory reason for the adverse action. *Coleman v. Donahue*, 667 F.3d 835, 845 (7th Cir. 2012). If the District successfully rebuts Antlitz's *prima facie* case, then the burden will shift back to Antlitz, "who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.*

Antlitz ultimately fails to establish a *prima facie* case of discrimination because she cannot show that a similarly situated person outside her protected class was treated more favorably than she was. The Seventh Circuit has defined "similarly situated" to mean an individual who is directly comparable to the plaintiff in all important ways. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). To be sure, the other employee need *not* be identical to Antlitz, nor is there a "mechanical magic formula"—rather, the inquiry is "flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (cleaned up).[8] Some common features are "whether the employees being compared (1) were supervised by the same person, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (cleaned up).

---

[8]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

Antlitz points to seven male coworkers whom she alleges "were subject to the same code of conduct, yet were disciplined more leniently, if at all, for the same conduct by the same decisionmakers." Pl.'s Resp. Br. at 8; *see also* DSOF ¶ 58. One glaring problem undermines Antlitz's arguments: she has no personal knowledge or other admissible evidence of what happened with these other coworkers. Antlitz had the chance during discovery to obtain employment records, disciplinary files, and affidavits or deposition testimony to establish that the coworkers were similarly situated to her. But she apparently did not do any of that. *See Winsley v. Cook County*, 563 F.3d 598, 605 (7th Cir. 2009) ("[Plaintiff] had the opportunity … to request documents and conduct depositions … to shed light on whether [the co-worker] was, in fact, similarly situated. She failed to do so, and her vague assertions alone do not establish that [the co-worker] was directly comparable to her in all material respects."). Specifically, Antlitz's testimony about coworkers Dan Spencer, Chris Anchor, Tony Showerman, and Gene Gallagher is inadmissible because, on this record, Antlitz has no personal knowledge of what happened. *See, e.g.*, PSOF, Exh. B at 74:7-75:16, 77:20-80:1, 109:8-111:21, 120:14-121:15. For example, Antlitz testified that Dan Spencer was never disciplined for meeting with contractors, discussing their work, and altering their techniques and work locations—either as Ecologist I or as Ecologist II. *Id.* at 74:7-75:16. Nowhere in the record, however, does Antlitz explain how she came to learn this information. Although a non-movant's own deposition testimony may alone be sufficient to create genuine issues of material fact, this testimony has to be based on personal knowledge or be otherwise admissible at trial.

*See Marr v. Bank of America, N.A.*, 662 F.3d 963, 968 (7th Cir. 2011) ("[U]ncorroborated, self-serving testimony, if based on personal knowledge or firsthand experience, may prevent summary judgment against the non-moving party, as such testimony can be evidence of disputed material facts."). Again, business records in the form of personnel files and disciplinary records might have filled the evidentiary gap. But Antlitz offers none of that. So the lack of admissible evidence undermines Spencer, Anchor, Showerman, and Gallagher as similarly situated employees.

Antlitz also asserts that Marvin Coleman, a forestry worker for the District, was similarly situated to her. *See* PSOF ¶ 34; Pl.'s Resp. Br. at 8. She testified that "Marvin Coleman told me he attempted to record people who were making abusive statements of him. I recall that Mr. Raudenbush told me that Marvin Coleman had attempted to record him." PSOF, Exh. B at 117:3-9. Antlitz also testified that "Mr. Raudenbush had stated that he had accused him [Coleman] of using information technology including email and other devices for an unauthorized purpose." *Id.* at 114:7-13. She could not remember what discipline Coleman received, but testified that he was not fired. *Id.* at 119:21-120:1. These sketchy details also do not permit a finding of comparability. It is true that Antlitz was accused of using "information technology … for an unauthorized purpose[,]" PSOF, Exh. C at Exh. 11 (FPD000011-12), but the premise of the accusation was the allegedly unauthorized sharing of O'Leary's comments on a draft plan to non-District persons. As far as the record shows, Coleman did not distribute information outside the District, and the misuse

of technology (to record conversations, in Coleman's case) is the only common factor between Coleman and Antlitz's alleged misconduct. It is also unknown what role Director McCabe played in deciding on Coleman's discipline (whatever it was); even if McCabe supervised Coleman (as Antlitz believes, PSOF, Exh. B at 113:12-16), there is a gap in the record evidence on this crucial point. What's more, Antlitz offers no evidence on other questions that are important for comparing employees: whether Coleman reported to the same supervisors, had similar job duties, was subject to the same standards, and (most importantly) had a similar disciplinary history. *See, e.g.*, *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690-91 (7th Cir. 2008). The limited information Antlitz provides would not permit a reasonable jury to infer discrimination from Coleman's supposedly more lenient treatment. *See id.* at 691.

The same goes for Antlitz's proffered evidence about Joel Rosario. It is true that Antlitz elicited some general testimony from McCabe that Rosario was still employed by the District even though he had been disciplined for performing at less than satisfactory level in any job classification, for failure to work in accordance with county policies, procedures, or practices, and for fighting or disruptive behavior. PSOF ¶ 29; PSOF, Exh. C at 24:1-27:6. But beyond that high-level, detail-free testimony, McCabe could not remember any of the specific incidents for which he disciplined Rosario. PSOF, Exh. C at 23:24-24:24, 25:24-26:12. Again, this is where employment records and disciplinary files might have filled the gap in evidence, but Antilitz does not offer any. Antlitz also contends that Rosario was treated more favorably because McCabe reviewed Rosario's evidence at his pre-disciplinary

hearing but did not do the same for Antlitz. PSOF, Exh. B at 53:15-54:1, 55:14-22. But Antlitz provides no evidentiary foundation for this assertion. *Cf. Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) (holding that the plaintiff failed to identify a similarly situated employee where she "presented only vague, conclusory assertions about incidents outside her personal knowledge."). So even if Antlitz and Rosario may have violated some of the same *general* policies, that alone does not make them similarly situated.

Next, Antlitz argues that John Raudenbush was similarly situated because he was also disciplined for negligence in performance of duties, yet received only a one-day suspension. Pl.'s Resp. Br. at 8; *see* PSOF, Exh. B at 68:3-70:4. Antlitz does describe some of Raudenbush's conduct towards her, including that he refused to work with her and made derogatory comments against her. *See, e.g.*, PSOF Exh. B at 71:14-72:15. But Antlitz offers no evidence about the basis of the District's discipline against Raudenbush. Was it the conduct directed at Antlitz? Or did the District only credit part of what Antlitz alleged? Or was it something else altogether? The record also contains passing references that Antlitz accused Raudenbush of discriminating against her based on her sex, but here too there is no admissible evidence about what the District did with that accusation. *See, e.g.*, DSOF, Exh. B at 14:20-23.

Because Antlitz is unable to demonstrate that a similarly situated male employee was treated more favorably than she was, she cannot make out a *prima facie* case for sex discrimination. She offers no other route to proving sex

discrimination, so the District's motion for summary judgment is granted as to this claim.

## B. Title VII Retaliation (Count 2)

The District also moves for summary judgment on the Title VII retaliation claim, which Antlitz premises on the filing of her EEOC charge in 2013. The District argues that the retaliation claim fails "for want of evidence of a causal connection between her protected activity—filing the EEOC charge—and her termination." R. 39, Def.'s Reply at 14. The Court disagrees.

To survive summary judgment on a retaliation claim, a plaintiff must provide sufficient evidence that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was motivated by the protected activity. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). Ultimately, the plaintiff must show that her protected activity was the but-for cause of the adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).[9] The passage of time between the protected activity and the adverse action is not dispositive, and "there are cases in which a plaintiff can demonstrate causation despite a substantial time lag." *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017) (cleaned up); *see also Hicks v. Forest Preserve Dist. of Cook County*, 677 F.3d 781, 789 (7th Cir. 2012) ("[T]here are no bright-line rules to apply when

---

[9]It is important to remember that a showing of but-for causation is *not* the same as showing *sole* causation. "The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014); *see also Mollet v. City of Greenfield*, 926 F.3d 894, 897 (7th Cir. 2019).

considering the temporal proximity of adverse actions to protected activities because it is a fact-intensive analysis.").

In this case, despite the nearly three-year gap between the 2013 charge and the 2016 firing,[10] Antlitz has provided enough circumstantial evidence to permit a reasonable jury to infer a causal link between the charge and the firing. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014) (explaining that retaliation charges may proceed in the face of long intervals when additional circumstances demonstrate that an employer's acts may not be legitimate). Among other things, circumstantial evidence allowing a jury to infer retaliation may include: "(1) suspicious timing, ambiguous statements of animus or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 973 (7th Cir. 2012). Here, Antlitz has offered just enough evidence of a statement criticizing the filing of the EEOC charge, as well as pretextual reasoning for her firing.

### 1. Criticism of EEOC Charge

As described earlier, on January 25, 2016, Antlitz sat down with O'Leary for her performance evaluation. When Antlitz showed O'Leary the email from the OIG investigator, O'Leary responded, "I take it this means you filed a complaint against me. I'm really sorry to see you go this way. *This is like the little lawsuit you have going.*" PSOF ¶ 6 (emphasis added); PSOF, Exh. B at 238:4-21. When viewed in the light most favorable to Antlitz, this statement is evidence of O'Leary's derogatory

---

[10]The parties do not dispute that Antlitz engaged in protected activity when she filed a discrimination charge with the EEOC and the IDHR in 2013. *See* Def.'s Reply at 12-14.

attitude against Antlitz's EEOC charge (the "little lawsuit") and the subsequent investigation of it.[11] Even three years after its filing, a reasonable jury could infer that O'Leary still bore an animus against the EEOC charge's filing. *See Greengrass v. Int'l Monetary Sys. Ltd*, 776 F.3d 481, 486 (7th Cir. 2015) (holding that an inference of retaliation arose from an email that reasonably could be "interpret[ed] … as evincing disdain for the EEOC process and animus against [the plaintiff] for filing her complaint."). To be sure, the jury could just as reasonably find that O'Leary was not referring to the EEOC charge or that he was not expressing a disparaging animus against the charge. Ultimately, whether O'Leary's statement comprised an implicit threat of retaliation is an appropriate question for the jury. *See Kasten*, 703 F.3d at 974.

The District is correct that O'Leary's statement is not enough, on its own, to establish a causal connection between the 2013 charge and the 2016 firing. Def.'s Reply at 13. Together with other facts, however, "evidence that would be insufficient standing alone can be sufficient to defeat summary judgment if a reasonable jury ultimately could conclude that the plaintiff was the victim of illegal discrimination or retaliation." *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013). In this case, Antlitz has also proffered enough evidence that the District's reasons for firing

---

[11]Antlitz also provided part of an email, likely sent to Ambriz, where Antlitz further described O'Leary's attitude in the meeting after learning of the OIG complaint: "He pretty much got angry and silent and walked out without attempting to clarify what the true situation was as to the endangered species and management plan for Schaumburg grasslands. I felt very threatened by his tone of voice, body language, lack of eye contact, and words." PSOF, Exh. B (FPD001780).

her were pretextual, leaving retaliation as the real motive in light of O'Leary's "little lawsuit" remark.

## 2. Pretext

To show pretext, Antlitz must produce enough evidence to support one of the following: "(1) defendant's explanation had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient to warrant the discharge." *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994). There is a difference between a *pretextual* decision and a *mistaken* decision: "the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) (cleaned up). In the administrative proceedings and in this case, the District has offered three reasons for the firing. DSOF, Exh. C at Exh. 11; DSOF ¶ 23. Antlitz argues that these reasons did not actually motivate the firing. Pl.'s Resp. Br. at 12. The Court examines each in turn.

### a. January 19, 2016 Group-Wide Email

In the letter announcing Antlitz's firing, the District relied in part on Antlitz's January 2016 release of the Bluff Spring draft plan with O'Leary's comments and her objections. Specifically, Antlitz shared her "written objections to proposed changes … to an internal draft of a Forest Preserve work document with several individuals who are not employees of the Forest Preserve." PSOF, Exh. C at Exh. 11 (FPD000012). The District also alleged that, in response to her supervisor's request to remove a

particular sentence, Antlitz "1) publicly accused [her] employer of violating its obligations to the State and 2) reference and attach a link to a specific page of an unrelated document in which the credentials of one of your co-workers are scrutinized." *Id.* The District claimed that Antlitz "attempted to impugn the reputation" of a coworker, her supervisor, and the Forest Preserve. *Id.* The District thus fired Antlitz for violating Cook County Rules 8.03(b)(3), 8.03(c)(1), 8.03(c)(2), 8.03(c)(14), and 8.03(c)(16). *Id.*

In response, however, Antlitz has offered enough evidence to raise a genuine dispute on whether the District honestly believed that what Antlitz did was really misconduct. *See Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1013 (7th Cir. 2004) (the plaintiff failed to show pretext where he did not "put forth competent evidence that [the employer's] belief in the conclusions of the IAD's report [detailing alleged misconduct] was so incredible as to allow a jury to conclude that he did not really put credence in the report."). For starters, between September and December 2015, the document in question—the draft management plan for the Bluff Spring Fen—was "exchanged back and forth, and at no point did O'Leary direct Antlitz to stop copying others on the email exchanges."[12] Pl.'s Resp. Br. at 12; *see also* PSOF, Exh. E at 337:10-22, Exhs. 11-14. Indeed, during the back-and-forth, on December 18, 2015,

---

[12]The District argues that "O'Leary had previously emailed Antlitz specifically directing her not to forward correspondence to outside parties." DSOF ¶ 29. The District cites to O'Leary's testimony in the administrative hearing, which in turn refers to an exhibit that purportedly shows this instruction. DSOF, Exh. E at 51:7-24. Although O'Leary testified that his email conveyed to Antlitz that he was not happy with her forwarding documents to outside parties, *id.* at 51:7-11, Antlitz denies that this is what the document states, Pl.'s Resp. DSOF ¶ 29. Because neither party provided the actual exhibit, this fact remains in dispute.

O'Leary replied to the entire group that he would review the draft and send his comments. PSOF, Exh. E at Exh. 13. It is true that O'Leary's January 2016 comments were emailed only to Antlitz. But it is equally true that nowhere in that email did he ask that either his response or Antlitz's reply be kept internal to the District. PSOF ¶17; PSOF, Exh. E at Exh. 15. Antlitz also testified that she interpreted O'Leary's December 18 email—in which he tells the group that he would send his comments— as permission to share the draft. PSOF, Exh. B at 86:4-18. On top of all this, Halloran (the volunteer steward who had signed the draft plan) was copied on the emails, and he testified at the administrative hearing that it was not unusual for him—an outsider—to receive drafts of working documents from the District. PSOF ¶ 14; PSOF, Exh. A at 168:13-16. According to Antlitz, the group was "working on a collaborative draft that requires consensus." PSOF, Exh. B at 94:14-21. In fact, despite its claims to the contrary, *see, e.g.*, DSOF, Exh. B at Exh. 3 (FPD001110), the District did not produce any evidence that the email caused the District any damage or disrupted its work in any way. Based on all these facts, a reasonable jury could conclude that relying on this basis for firing Antlitz is so unreasonable that it raises the inference of pretext. *See, e.g., Jones v. Union Pacific R.R.*, 2001 WL 300316, at *6 (N.D. Ill. March 28, 2001), *aff'd*, 302 F.3d 735 (7th Cir. 2002) (the plaintiff did not show pretext when he argued that his conduct was insufficient to warrant the discharge, but then failed to shown that his employer violated its own policy or that its construction of its own policy was so unreasonable so as to suggest pretext); *Gordon v. United Airlines Inc.*, 246 F.3d 878, 889 (7th Cir. 2001) (explaining that a

factfinder may reasonably infer a pretextual motive "when the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt." (cleaned up)).

Antlitz also denies that she was trying to disparage or embarrass any co-workers when she included the link to the OIG Report in one of her comments to O'Leary. *See, e.g.*, Pl.'s Resp. DSOF ¶ 23. Although the District accused her of revealing an employee's personnel status to outside parties, *see* DSOF, Exh. B at Exh. 3 (FPD001110), Antlitz notes that the link she shared opens a *public* document, which does not even mention any District employees by name, Pl.'s Resp DSOF ¶ 61; Pl.'s Resp. Br. at 4. It is true that, according to McCabe, in deciding to fire Antlitz, he took into account the 2012 discipline imposed on Antlitz, when she had allegedly disparaged the same co-workers to a third-party. DSOF, Exh. D at 108:21-109:17. But the District provided no admissible evidence that Taron, Halloran, or Byers knew the identity of the District personnel discussed—unnamed—in the OIG Report.[13] Similarly, the District offered no evidence to support its claims that Antlitz's actions "disrupted the Forest Preserve's process for completing the document at issue." PSOF, Exh. C at Exh. 11 (FPD000012). Considering the lack of any evidence to support the District's claim that an employee's personnel status was revealed or that the District's work was disrupted, a reasonable jury could reasonably infer that the District did not honestly believe that Antlitz's actions warranted termination.

---

[13]McCabe's testimony at the administrative hearing that "the link to the Inspector General's report about a non-related employee that these other people know, they know who the person is … [,]" PSOF, Exh. A at 59:13-16, is not admissible for lack of foundation, absent any other details.

## b. Alleged Intimidation Attempt

The District also claims that it fired Antlitz because, on January 25, 2016, at the end of her performance-evaluation meeting, Antlitz handed O'Leary "non-relevant correspondence" referencing "a possible Investigation of the Resource Management Department" in connection with O'Leary. PSOF ¶ 19; PSOF, Exh. C at Exh. 11 (FPD000012). The District argued that "McCabe did not discipline Antlitz for complaining to the [OIG], but he did discipline her for the manner in which she flaunted the [OIG's] investigation to O'Leary" and that "McCabe and O'Leary honestly believed that Antlitz was attempting to threaten O'Leary." Def.'s Mot. Summ. J. at 9-10; *see also* DSOF, Exh. D at 103:19-104:4; DSOF, Exh. E at 62:2-12.

Antlitz has provided enough evidence to allow a reasonable jury to conclude that sharing the OIG email did not warrant firing, and to doubt the sincerity of the District's belief that Antlitz was trying to intimidate O'Leary. In the March 2016 termination letter, the District contended that Antlitz's actions "were disruptive to the performance review process and appear to serve no purpose other than to suggest to [her] supervisor that because [she was] not satisfied with his evaluation of [her] performance [she] would seek, once again, to have the Cook County Office of the Independent Investigator investigate [her] supervisor." PSOF, Exh. C at Exh. 11 (FPD000012). Viewing the evidence in Antlitz's favor, however, Antlitz handed O'Leary the document in order to clarify the status of the Schaumburg Grassland schedule. PSOF, Exh. A at 212:1-10; *see also* Pl.'s Resp. DSOF ¶ 19; PSOF, Exh. B at 226:2-9. According to Antlitz, she did so to ensure that she was sending the stewards

the most up-to-date schedule. PSOF, Exh. A at 213:9-19; *see also* PSOF ¶ 5; PSOF, Exh. B at 226:2-9, 236:20-237:1. *After*—and only after—O'Leary said that he did not know of any changes, Antlitz gave him the OIG email "to show documentation that someone is saying there has been a change in the plan which would have been a positive change … ." Pl.'s Resp. DSOF ¶ 19; PSOF, Exh. B at 253:8-254:12. In its reply brief, the District does not address this evidence, nor does it explain how or why, in spite of Antlitz's questions about the Schaumberg Grassland, the District's belief that Antlitz was trying to threaten O'Leary was still genuine. "If the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses. In such circumstances, the employee creates a factual issue as to whether the employer's explanation is credible or merely a pretext … ." *Gordon*, 246 F.3d at 889.

It is worth noting too that Antlitz had drawn a box around the paragraph in the email that she wanted to discuss with O'Leary. PSOF, Exh. A at 212:13-19; DSOF, Exh. 24. The highlighted paragraph, which corroborates her testimony on the substance of their conversation (or at least a jury could so find), says.

> Our office has received information … that your superiors and/or RM management has been more receptive to the site management plans you or other Ecologists presented … and have changed the plan back to the one you revised to accommodate conservation plans for the black-billed cuckoo; and that management has approved the new, updated plan.

DSOF, Exh. 24 (cleaned up). In fact, during the administrative hearing on Antlitz's termination, O'Leary himself testified that Antlitz asked him about "the status of a

plan or something like that … ." PSOF, Exh. A at 64:13-17. A jury reasonably could conclude (as the ALJ did, PSOF ¶ 25; DSOF, Exh. F at 12) that O'Leary's testimony about the alleged intimidation was "exaggerated."

One final point on the Antlitz's alleged deployment of the OIG email as intimidation. According to Antlitz, at the pre-disciplinary meeting, McCabe—the ultimate decisionmaker as to her firing—pounded his fist and shouted at her, stating "you don't talk to the OIG." *See* Pl.'s Resp. DSOF ¶ 46; PSOF, Exh. B at 259:22-260:8; *see also Marr*, 662 F.3d at 968. This expression of McCabe's frustration at the OIG complaint's filing is another fact on which the jury could rely to find that the District was not concerned with the email's use for intimidation, but instead because Antlitz had made the complaint at all.

### c. Disruption of Contractor Work

In the letter explaining Antlitz's firing, the District provided a third reason for the termination: she "improperly interfered with a contractor on-site on January 22, 2016. After encountering the contractor in the field and expressing displeasure with some of the work and techniques, the contractor was required to disrupt work and reach back out to the District to resolve conflicting instructions." PSOF, Exh. C at Exh. 11 (FPD000012). Similarly, the Disciplinary Action Form said that "Ms. Antlitz contacted a contractor doing work and had a discussion with them that led to confusion over project tasks and goals. This disrupted the contractor's activities and led to this work being shut down for the day, and moved to another location." DSOF, Exh. B at Exh. 3 (FPD0011101). But a jury could find, as the ALJ did, that "it was

not inappropriate for Antlitz to carefully review the work site and make suggestions as to how best [to] protect the species within the parameters of the work order and without incurring additional costs[,]" especially because the work order already included some protection for the ash. Pl.'s Resp. DSOF ¶ 61; PSOF, Exh. D at 11. In fact, Antlitz provided evidence that it was Brenda Occhiuzzo—an Assistant Resource Project Manager at the District with final decision-making authority over contractor work for the Busse South Project—who specifically requested that Antlitz visit the work site. *See* PSOF ¶ 20; PSOF, Exh. P at 33:19-24; PSOF, Exh. E at Exh. 21.

The first time that she met with the contractor, Antlitz "discussed the most pragmatic way of protecting the ash seedlings from destruction and suggested hand tools." PSOF ¶ 20; PSOF, Exh. F at Exh. 3. When Showerman informed Antlitz that he did not approve of the contractor's request for hand tools, as Antlitz had suggested, Antlitz understood and stood down. PSOF ¶ 21; PSOF, Exh. F at Exh. 3.

In fact, the District explicitly argues that Antlitz "was not disciplined for meeting with contractors and discussing their work, she was disciplined for interfering with a contractor's work." Def.'s Reply at 8. But Antlitz has provided enough evidence to raise the inference that this proffered reason had no basis in fact. *See Hughes*, 20 F.3d at 746. Beyond its accusations in the termination letter and the Disciplinary Action Form, the District produced no evidence—either in this Court or in administrative proceedings—that any work was disrupted, or that Antlitz herself was the cause. *See, e.g.*, DSOF, Exh. F at 11 ("There is no evidence … that work was stopped or that Antlitz's comments or criticisms caused any financial loss to the

District."). For one, there is no evidence that Antlitz overstepped her authority by instructing the contractors to do anything or by unilaterally changing the work order. On the contrary, Antlitz produced evidence showing that the contractor himself asked for clarification on the removal of standing dead ash trees near a wetland, and she responded that he would have to talk to contract management because this was not in the work order. PSOF ¶ 23; PSOF, Exh. E at Exh. 21 (FPD001148). This was in line with District policy. *See, e.g.*, PSOF, Exh. D at Exh. 21 (Showerman writing to the contractor that "the final decision making on this project should come from Brenda or I"); *id.* at Exh. 22 (O'Leary instructing Antlitz that Showerman would "reach out to the contractor with instructions"). It is true that the contractor wrote to Showerman that Antlitz "wasn't really happy" about the treatment of elm and ash, and that mixed messages can be tough on the crew. But there is no evidence that the work ever stopped, or that Antlitz gave any instructions contrary to the work order. PSOF, Exh. E at 21 (FPD001144-46). So the factual record permits a reasonable jury to infer that the District's claim that Antlitz "interfered" with contractor work had no basis in fact. *See Hughes*, 20 F.3d at 746.

The District also asserts that Antlitz was fired for the contractor incident "because of her prior history of similar violations," referring to the three-day suspension Antlitz received for disrupting contractor work in 2012. Def.'s Mot. Summ. J. at 13; *see also* DSOF ¶¶ 60-61. This alone, however, does not bar an inference of pretext. Again, the jury can reasonably find, as the ALJ did, that the "conduct alleged in 2016 relating to contractors does not include the same objectionable elements as

the alleged conduct in 2012." Pl.'s Resp. DSOF ¶ 61; *see also* DSOF, Exh. F at 11 n.2. The 2012 conduct resulted in disruption; the 2016 conduct did not. Ultimately, because Antlitz provided a detailed refutation of the events underlying the District's contention that she interfered with contractor work on January 22, 2016, a reasonable jury may infer that the District's proffered reason had no basis in fact, and thus the District may not have honestly relied on it when firing her. *See Gordon*, 246 F.3d at 889.

Of course, this Court "cannot second guess [the District's] employment decisions to the extent that they were innocently unwise or unfair." *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018). Yet, despite the nearly three-year gap between Antlitz's protected activity in 2013 and her firing in 2016, Antlitz provided enough evidence that the District's acts were not legitimate to show causality and survive summary judgment. *See Malin*, 762 F.3d at 560. A reasonable jury could find that O'Leary's statement to Antlitz—"this is like the little lawsuit you have going," PSOF, Exh. B at 238:20-21—was a reference to the EEOC charge, and in contending that Antlitz was trying to threaten O'Leary, the District had been "'laying' for her, biding its time to create a space between the date of the claim and the date of the discharge, and in the interval gathering pretextual evidence of misconduct to provide a figleaf for its retaliatory action." *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 980 (7th Cir. 2000). So the District's motion for summary judgment on Antlitz's Title VII retaliation claims is denied.

### C. State and County Retaliation Claims (Counts 3 and 4)

The District also seeks summary judgment on Antlitz's retaliation claims under the Illinois Whistleblower Act and Section 2-291 of the Cook County Inspector General Ordinance. Antlitz argues that there is a genuine issue of material fact on whether she was fired because of her complaints to the IDNR and to the OIG. *See* Pl.'s Resp. Br. at 14-15. The Whistleblower Act prohibits retaliation against "an employee for disclosing information to a government or law enforcement agencies, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b).[14] Similarly, the County Ordinance prohibits retaliating against persons for communicating, cooperating, or assisting the Independent Inspector General in the performance of their duties. Cook County Ordinance, Ch. 2, Art. IV, Div. 5, § 2-291(a)(1).

Under the Whistleblower Act, what is needed to pursue a retaliation claim is similar to the standard for retaliation claims under Title VII. In order to establish a claim under section 15(b) of the IWA, Antlitz must show: "(1) an adverse employment action by his or her employer, (2) which was in retaliation (3) for the employee's disclosure to a government or law enforcement agency (4) of a suspected violation of an Illinois or federal law, rule, or regulation." *Sweeney v. City of Decatur*, 79 N.E.3d 184, 188 (Ill. App. Ct. 2017). Antlitz must have done more than voice her suspicion of unlawful conduct—she must have actually reported the suspected violation of state

---

[14]Because Antlitz does not present or develop any arguments in favor of her retaliation claim under 740 ILCS 174/20, 20.1, and 20.2, *see* Am. Compl. at ¶ 55, those arguments are waived.

or federal law to the pertinent authority. *See Bello v. Vill. of Skokie*, 151 F. Supp. 3d 849, 865 (N.D. Ill. 2015) (citing *Brame v. City of North Chicago*, 955 N.E.2d 1269, 1271 (Ill. App. Ct. 2011)). To show causation, Antlitz must provide sufficient evidence that the District had a retaliatory motive. *See Michael v. Precision Alliance Grp., LLC*, 952 N.E.2d 682, 688 (Ill. 2011). "Causation cannot be shown where the employer has a valid, non-pretextual reason for taking adverse employment action." *Bello*, 151 F. Supp. 3d at 865. In light of the similarity between the County Ordinance and the Whistleblower Act, the Court will analyze the two under the same standard.

Antlitz has more than enough evidence that she reported unlawful conduct to the OIG and the IDNR. In April 2015, Antlitz submitted an online complaint to the IDNR in which she reported violations of the Endangered Species Act and complained that her supervisor ordered her not to report the violations or contact the police without his permission. PSOF, Exh. B (FPD001780-81); *see also* DSOF ¶ 14; DSOF, Exh. B at 230:2-12. She informed O'Leary of the report that same month. DSOF ¶ 15; PSOF, Exh. B at 230:2-12. On April 8, 2015,[15] Antlitz also requested proof from O'Leary (copying McCabe) that the District had completed the consultation requirement of the Endangered Species Act with respect to the Schaumburg Grassland plan; without that consultation, "there is a violation to be reported to the state." PSOF, Exh. E at Exh. 7 (FPD001783). A few days later, Antlitz shared with O'Leary and McCabe email communications with Keith Shank at the IDNR (as noted

---

[15]It is not apparent from the record when precisely in April 2015 Antlitz submitted the online report to the IDNR, and thus whether her April 8 email to O'Leary occurred before or after her report.

earlier, Shank worked in the IDNR's Impact Assessment Section), in which Shank asserted that the proposed Schaumburg plan required consultation with the IDNR under Illinois law. *Id.* at Exh. 8 (FPD001789-90). In the emails, Antlitz responded to Shank saying "[i]t would be a very good thing if an authority at the IDNR would approach the FPD leadership and make this legal obligation clear." *Id.* (FPD001789).

These facts permit a reasonable jury to conclude that Antlitz reported a suspected violation of state law to a government agency for the purposes of the Whistleblower Act. *See Sweeney*, 79 N.E.3d at 190-91 ("Simply having a conversation with the wrongdoer about the impropriety of his or actions is not exposing the alleged improper activity, making it known, or reporting the wrongful conduct."). And considering Antlitz's in-depth knowledge of the Schaumburg Grassland plan, *see, e.g.*, PSOF, Exh. E at Exh. 9, she has successfully raised the inference that she reasonably believed that the District's activities were unlawful. *See* ILCS 740 174/15(b); *see also Coffey v. DSW Shoe Warehouse, Inc.*, 145 F. Supp. 3d 771, 778 (N.D. Ill. 2015) (explaining that a retaliation claim under the Whistleblower Act requires showing that the "plaintiff's belief that the law had been violated was reasonable").

On the County Ordinance claim, Antlitz also has produced evidence that she made reports of unlawful conduct to the OIG. On July 29, 2015, Antlitz sent an email to OIG Investigator Lorraine Ambriz, reporting on a May 20 meeting with O'Leary about the Schaumburg Grassland plan, during which "he expressed intent to ignore the endangered species act and re-draft the schedule." PSOF, Exh. E at Exh. 9. Several months later, on November 13, 2015, Ambriz informed Antlitz that the OIG

received information that District management approved a revised management plan to accommodate conservation plans for the black-billed cuckoo. *See* DSOF, Exh. C at Exh. 24; DSOF ¶ 17. According to the email, Antlitz told the OIG that O'Leary deleted the protections for the black-billed cuckoo and scrapped the revised plan, and Ambriz in turn wanted to know whether "anything has improved, changed or if there are any updates since we last spoke with you at our office." DSOF, Exh. C at Exh. 24. Ambriz also noted, "information came into our office that you contacted the IDNR Conservation Police department or other entity sometime in April 2015 regarding a destruction of the black-billed cuckoo's habitat. Can you provide us with any information regarding that?" *Id.* This email from Ambriz suggests that Antlitz reported unlawful conduct to the OIG in previous conversations. In her response to Ambriz, Antlitz reiterated her concerns about the District's "lack of regard for the state laws of endangered species, [and] their refusal to participate in the required consultation process with IDNR." PSOF, Exh. B (FPD001781).

Although the factual record does not include Antlitz's initial communications with the OIG, the emails she did provide contain specific descriptions of the District's alleged unlawful conduct in violation of the Endangered Species Act. Thus, Antlitz provided enough evidence to allow a reasonable jury to infer that she reported unlawful conduct to the OIG for the purposes of both the Whistleblower Act and the County Ordinance.

The District argues, however, that it is entitled to summary judgment on the Whistleblower Act claim due to the "lack of temporal proximity" between Antlitz's

April 2015 complaints to the IDNR and the March 2016 firing. Def.'s Mot. Summ. J. at 13. The District also argues that Antlitz's claims under the Whistleblower Act and the County Ordinance both fail because the District fired Antlitz for legitimate reasons. *See id.* These arguments fail. As previously discussed, an employee can raise an inference of illegal retaliation—despite a long gap between the protected conduct and the adverse employment action—if she provides circumstantial evidence of a causal link. *See Baines*, 863 F.3d at 666; *Malin*, 762 F.3d at 560; *Kasten*, 703 F.3d at 973.

As detailed earlier in this Opinion, Antlitz successfully raises the inference that the District's proffered reasons for firing her were pretextual. *See supra* Section B(2)(a)-(c). So this analysis will highlight only a few more pieces of circumstantial evidence. For one, Antlitz testified that the District once held a training about the OIG's existence and the right of employees to share their concerns of ethics violations with the OIG. PSOF, Exh. B at 273:6-22. According to Antlitz, McCabe warned after the training, "[I]f I ever find out you reported me, you are going to be in a world of hurt." PSOF, Exh. B at 273:6-22; Pl.'s Resp. DSOF ¶ 22. As noted earlier, during the pre-disciplinary meeting, McCabe allegedly pounded his fist on the table and shouted at Antlitz "you don't go to the OIG." PSOF, Exh. B at 259:22-260:8; *see also* Pl.'s Resp. DSOF ¶ 46. A reasonable jury may infer that, after McCabe learned of Antlitz's complaint against the District—and by extension, against McCabe himself as the Director of Resource Management—he decided to carry out his earlier threat.

Remember too that, on Antlitz's performance evaluation, O'Leary wrote, "In 2015, Debbie contacted outside agencies and groups to oppose decisions made by district staff. This has resulted in a lot of unnecessary work for staff and in some cases, damaged the district's reputation." Def.'s Resp. PSOF ¶ 4; PSOF, Exh. O (FPD001153). On the bottom of the evaluation, Antlitz responded, "My 'oppositions' pertained to actions that were violations of Illinois Nature Preserve Plans and the Illinois Endangered Species Act … ." Def.'s Resp. PSOF ¶ 4; PSOF, Exh. O (FPD001154). Because O'Leary did not learn of the OIG investigation until the conclusion of the review, a jury can reasonably infer that O'Leary was referring to Antlitz's complaint to the IDNR when he criticized her contact with outside agencies. Lastly, it bears repeating that a reasonable jury can rely on O'Leary's implicit criticism of the complaint to the OIG, "I take it this means you filed a complaint against me. I'm really sorry to see you go this way." PSOF, Exh. B at 238:10-21. The jury thus may find retaliation under the Whistleblower Act and the County Ordinance.

## IV. Conclusion

For the reasons stated above, the District's motion for summary judgment is granted against the Title VII sex discrimination claim. But Antlitz's retaliation claims under Title VII, the Illinois Whistleblower Act, and the Cook County Ordinance survive. After the lawyers confer with their respective clients, settlement negotiations must commence in earnest. To that end, by October 9, 2019, Antlitz shall serve a demand on the defense. The defense shall respond by October 18, 2019. The

defense shall email the demand and the offer to the Court's Proposed Order email account on October 18, 2019. The status hearing of October 16, 2019 is reset to October 23, 2019, at 11 a.m. The parties may call the courtroom deputy for a settlement referral in advance of the status hearing.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2019