EXHIBIT 1

**COOK COUNTY**

**EMPLOYEE APPEALS BOARD**

IN THE MATTER OF )

) EAB No. 2016-01

Deborah Antlitz )

## ORDER

This matter coming before the Board for review of the findings and recommended decision of the hearing officer appointed by the Board, the Board having been advised and having reviewed the findings of the hearing officer,

**THE BOARD ORDERS:**

1. The Employee Appeals Board adopts the findings and recommended decision of Administrative Law Judge, Joanne Kinoy.

2. The Cook County Forest Preserve District is hereby ordered to reinstate Deborah Antlitz to her position, with full backpay, less 29 days representing the reduction in sanction from termination to a 29 day suspension.

3. This case is dismissed pursuant to this order.

Entered this 26 day of October, 2016.

**EMPLOYEE APPEALS BOARD**

By: _____
MEMBER

By: _____
MEMBER

By: _____
MEMBER

By: _____
MEMBER

By: _____
MEMBER

# EXHIBIT 1

COOK COUNTY

EMPLOYEE APPEALS BOARD

IN THE MATTER OF                              )

                                             )        EAB 2016-01

DEBORAH ANTLITZ                               )


**Statement of the Case:**

This matter comes before the Cook County Employee Appeals Board on the appeal by Appellant Deborah Antlitz challenging her termination from employment with the Forest Preserve District of Cook County.  The issue to be determined is whether the Forest Preserve District of Cook County (hereafter the "Forest Preserve" or "District") had just cause to terminate the employment of Deborah Antlitz (hereafter "Antlitz" or "Appellant") for alleged violations of the Cook County Personnel Rules, and if not, what, if any, lesser discipline was appropriate.

**Procedural History:**

On February 4, 2016 Charles O'Leary, Deputy Director Resource Management, issued a Disciplinary Action Form to Antlitz. (FPEx. 2)   Antlitz also received notice signed by John McCabe, Director of Department of Resource Management, of a pre-disciplinary hearing to be held on February 22, 2016. (FP Ex.2) The pre-disciplinary hearing was held with Antlitz, O'Leary, Lisa Huge, Keino Robinson and Amy Cramer, counsel for Antlitz present.  On March 28, 2016 McCabe sent Antlitz a letter terminating her employment, effective immediately. (FP Ex. 2)

Antlitz filed a timely appeal with the Cook County Employee Appeals Board.  The Board referred the matter to the Cook County Department of Administrative Hearings to hold an evidentiary hearing on the matter.  The matter was assigned to Administrative Law Judge, Joanne Kinoy, ("ALJ") and a hearing was held on August 24, 2016 at the offices of the Cook County Department of Administrative Hearings, Chicago Illinois.

The Forest Preserve was represented by Keino  R. Robinson, Chief Labor Counsel for Forest Preserve District  of Cook County.   Antlitz was represented by Amy Cramer and Thomas Cramer of Cramer Law Chicago, P.C..   Almost all of the exhibits were admitted through stipulation of the parties.  The ALJ admitted Forest Preserve Exhibits 1through 28. [1] (Exhibit 1 was admitted over the objection of the Appellant) and Antlitz Exhibits 1 through 47. Troy Showerman, John McCabe, Charles "Chip"O'Leary testified on behalf of the Forest Preserve.  Deborah Antlitz, Leon Halloran and Steven Byers testified on behalf of Antlitz.  The hearing was concluded in one day and transcripts prepared.  [2]At the request of the

---

[1] Forest Preserve Exhibits will be identified as: FP Ex. "___"
   Deborah Antlitz Exhibits will be identified as Ant. Ex. "___".

[2] The transcript was prepared in two parts.  The first hour of hearing was tape recorded and then transcribed. The remainder of the hearing was recorded by court reporter.  Testimony will be cited as: "name of witness" Tr. Pt. 1 or Pt. 2, and then page number. For example:  Showerman, Tr. Pt. 1, p. 8

ALJ, each party submitted a post hearing statement of the law relating to the "just cause" standard for discipline.

**Position of the Parties[3]**

1. It is alleged by the Forest Preserve, that on January 19, 2016 Antlitz improperly forwarded an email of a draft document containing internal comments and disagreements with her supervisor to outside third parties. The email included revisions directed soley to Antliz and in response she referenced an unrelated report that embarrassed and harassed another District employee all in violation of  Rules 8.03(b)(3), 8.03(c)(2), 8.03(c)(14) and 8.03(c)(16)

    Antlitz contends that she had been part of a collaboration to update the ecological plan for the Bluff Spring Fen.  She drafted an email with a draft of the document and sent it to Chip O'Leary, Steve Byers (Illinois Nature Preserve), Doug Taron, President of Friends of Bluff Spring Fen and Leon Halloran of Friends of the Fen.  It was common to include these stakeholders, and to share drafts of the document to arrive at a consensus.  Since all of the parties would ultimately have to approve the document, it was imperative to include all parties in the revision process. In summary Antlitz contends that she was acting within the confines of her job and in accordance with usual protocol.

2. It is alleged by the Forest Preserve, that on January 22, 2016 Antlitz had interaction with a third party contractor that was performing work for the District.  Although Antlitz was given clear instruction on the work to be done, she created confusion by giving the contractor contradictory information to the District's instruction.  As a result the contractor's work came to a halt and created an unscheduled shift in the work to be performed all in violation of Rules 8.03(b)(3),8.03(c)(2) and 8.03(c)(14)

    Antlitiz contends that employees from the District's project management team set up a time for Ms. Antlitz to meet with the contractors on site.  While at that meeting the contractors asked Antlitz questions and  she gave her opinion about the completed work and the work order. She told the contractor that he would have to discuss any changes in the work order with the project coordinator, Troy Silverman.  Antlitz contends that did not intend to create confusion and that her actions were in conformity with the work order and her job responsibilities.

3. It is alleged by the Forest Preserve that right after the conclusion of her annual review, Antlitz handed, unsolicited, a copy of an email exchange between the Office of the Independent Inspector General ("OIIG") that identified the Resource Management Department and her supervisor, Charles O'Leary as subjects of a possible investigation.  The email was unrelated to the performance review and was interpreted by O'Leary as an attempt to harass and intimidate him all in violation of Rules 8.03(b)(3) and 8.03(c)(11).

    Antlitz contends that after she and her superior had discussed her evaluation and she had entered her comments and signed the document, she inquired about an issue relating to Forest Preserve ecology.  She showed O'Leary a copy of an email that indicated that the OIIG

---

[3] This section is taken largely from the Joint Pre-Hearing Memorandum submitted by the parties and made a part of the administrative record.

was investigating whether the Forest Preserve had violated the Endangered Species Act.  Antlitz wanted to know whether the district had addressed the issue.  Antlitz did not attempt to coerce or harass her supervisor but was attempting to discuss a pressing work related issue with her supervisor.

**Relevant Provisions of the Cook County Personnel Rules[4]**

**8.03    Policy:**

(a)      Employee behavior contrary to the Rules of Conduct shall be subject to disciplinary action, up to and including discharge, depending on the nature of the infraction;

(b)      Disciplinary action for major cause infractions need not be progressive.  "Major Cause" is defined as, but not limited to, the following behavior by an employee on duty or on the premises of any County Facility:

3. Fighting or disruptive behavior;

(c)      Other violations which will result in disciplinary action include, but are not limited to, the list specified below:

**NO EMPLOYEE SHALL DO ANY OF THE FOLLOWING WHILE ON DUTY OR WITHIN COUNTY FACILITIES:**

1. Misuse confidential or proprietary information, including patient or personnel records, Hospital reports or tests, or any department files, documents, or data;
2. Fail to follow instructions or fail to work in accordance with County policies, procedures and/or practices;
14. Perform at less than a satisfactory level in any job classification;
16. Use any information technology or County instrumentality, including, without limitation e-mail, Internet services or telephone, for an unauthorized purpose. Employees are forbidden from installing or using unlicensed computer software on County-issued computers.

**8.04    DISCIPLINARY ACTION**

**8.041   Scope:**

Disciplinary action procedures apply to all career service employees.

**8.042   Policy:**

(a)  Disciplinary action is taken when an employee has committed an infraction of a County rule as specified in Rules of Conduct, or other behavior deemed unacceptable;

(b)  Disciplinary action must be timely, and progressive, and is based upon the commission of the same, similar, or other infractions, except for MAJOR CAUSE infractions;

(c)  All discipline shall be given only for just cause.  The level of disciplinary action and/or degree shall be appropriate to the infraction including, if appropriate, a consideration of the following:

1. Documentation of the employee's past conduct;
2. Whether or not the employee was adequately warned and counseled of the consequences of his/her conduct;

---

[4] See: Ant. Ex. 1

3.   Length of service;
4.   Severity and circumstances of the particular offense;
5.   County practice in similar cases;
6.   Motives and reasons for violating a rule.
(d)  In general, discipline will include the following steps;
1.   1st Offense-Oral Reprimand
2.   2nd Offense-Written Reprimand;
3.   3rd Offense-Suspension
4.   4th Offense-Discharge
(e)  Disciplinary action for MAJOR CAUSE infractions, as specified in the Rules of Conduct, need not be progressive;
(f)  Disciplinary action may begin, or advance to, any step specified above dependent upon the nature of the infraction;
(g)  Disciplinary action may only be appealed in accordance with the Grievance/Appeals Board Procedure or any applicable collective bargaining agreement;
(h)  No career service employee may be discharged, demoted or suspended for more than ten days unless the statement of charges and any supporting documentation or evidence are first reviewed by the Chief before the employee is notified of such action.

## 8.43  PROCEDURE

### (f)  Discharge:

1.  Discharge is invoked for just cause, which is defined as follows:
    a.  Repetition of the same or similar infractions, or a combination of infractions of the Rules of Conduct for which there has been progressive disciplinary action.  An employee who has been previously suspended may be subject to discharge for the next offense;
    b.  Commission of an infraction considered "Major Cause" as defined previously.


**Findings Of Fact**

BACKGROUND

1.  Deborah Antlitz was employed by the Forest Preserves of Cook County since 1991.  She held various positions and titles as an Ecologist for the Forest Preserve.  From April 1, 2003 until her termination she held the title of Resource Ecologist II.  (Antlitz, Tr.2,p. 285) Most recently she reported to Charles O'Leary.
2.  Charles "Chip" O'Leary is Deputy Director for Resource Management. He has been employed by the District for 4 years. (O'Leary, Tr.1,p. 71)
3.  John McCabe is the Director of Department of Resource Management.  He has held that position since December, 2014.  He has worked in various positions for the Forest Preserve since 1994.
4.  Tory Showerman is the Resource Project Manager.  He has held that position since 2014. (ShowermanTr.1,p.26)
5.  Steven Beyers is a field representative for the Illinois Nature Preserve Commission. (Beyers Tr.2,p.242) One of his responsibilities is to protect and assist in the management of Illinois Nature Preserves in Northeastern Illinois. (Beyers, Tr.2, p. 243) Since 1990 Beyers has had

4

responsibility for oversight, protection and stewardship of the Bluff Spring Fen site. (Beyers Tr.2, p.244)

6. Leon Halloran is a retired chemist who is the volunteer steward at the Bluff Spring Fen. In that capacity he would be a signatory of the five year management plan for the site. (HalloranTr.2,p.275)

7. Doug Taron is the Director of the Peggy Notebaert Nature Museum and the President of the Friends of Bluff Spring Fen. (Antlitiz, Tr.2,p.289) In that capacity he would be a signatory of the five year plan for the site.

8. In 1991, 1992, 1993, 1994, 1995,1996,1997,1999, and 2000, Antlitz received excellent evaluations. (Ant. Ex.s 19-35) In 2012 Antlitz was evaluated by O'Leary and received an overall rating of 2.2 which was much lower than in prior years. (Ant. Ex. 36) She was placed on a performance plan for January through March 2013. (Ant. Ex. 37) At the end of this period O'Leary recommended that the performance plan not be continued as satisfactory improvement had been made. In 2013 and 2014 her overall ratings were "3" "meets all requirements." (Ant. Ex 38,39)

9. From the beginning of her employment until November, 2012 Antlitz did not receive any formal discipline.

10. In the fall of 2011 Antlitz filed an internal complaint alleging discrimination and unprofessional conduct by John Raudenbush. (Ant. Ex. 41)

11. In the fall of 2012 Antlitz was disciplined for inappropriate interference with a contractor resulting in work delay and for displaying inappropriate and unprofessional behavior in violation of Rules 8.03(b)(3), 8.03(b)(9), and 8.03(c)(2). She served a 3 day suspension. (FP Ex. 1)

12. On May 8, 2013 Antlitz filed a charge with the Illinois Department of Human Rights alleging that her suspension and low rating were due to sex discrimination and in retaliation for filing her internal complaint. The charge was dismissed in August, 2014. (FP Ex. 28)

13. In December, 2015 Antlitz sent an email regarding her assessment of a controlled burn at the Bluff Spring Fen to Forest Preserve employees and to Steven Byers, Illinois Nature Preserve Commission. O'Leary advised Antlitz by email that she should have circulated her report internally before including outside 'partners' because it otherwise it incorrectly suggests that her assessment is the official assessment of Forest Preserve. (FP Ex. 26) Antlitz was not disciplined for this conduct.

THE BUSSE SOUTH SHORELINE RESTORATION PROJECT

14. In the fall of 2015 Antlitz was involved in drafting a work order for the Busse South Shoreline Restoration Project. Antlitz had email discussions with Troy Showerman about including the protection of ash seedlings within the area. Antlitz wanted the order to mention protection of ash. Showerman stated in a reply email that he "honestly saw no reason to protect ash. I will not include as a target which should protect the majority of them by default." (FP Ex 6) The final work order stated in part: "Use caution. Native honey suckle in this area. Avoid treatment of ash saplings/ seeding." (Ant. Ex. 3) According to Mr. Showerman, the "avoid treatment" language indicates a lesser degree of protection with no additional expenditures. (Showerman, Tr. Part I, page 57-63)

15. In January, 2016 Showerman and his staff asked Antlitz to go to the site to review progress of the contract. Brenda Ochiuzzo, Assistant Project Manager wrote to Antlitz on January 13, 2016 and explained that the crew would probably not be on site the next day but that she could not meet with John Shannon. Antlitz agreed to meet Shannon the next day. (Ant. Ex. 5) Antlitz met with John Shannon from Tallgrass Restoration (contractor) on January 14, 2016. There was discussion among other topics, regarding the use of hand cutting to protect ash sprouts and seedlings. Antlitz told Shannon that he would have to talk to Showerman. Shannon contacted Showerman and Showerman wrote an email to Antlitz on January 14, 2016, saying he had told Shannon not to commit resources to protecting ash seedlings. (FP Ex. 17) Antlitz replied that "the work order we approved and moved forward on said to protect ash seedlings. It is not just ash in the area of question, but other non target species. A buzz saw is not appropriate or practical in an area where a few buckthorn are mixed with other shrub natives." (FP Ex 15) Showerman responded "the work order you sent had protection of ash, but I mentioned in my response about that work order that we would not be protecting ash. Attached is the work order Tallgrass used with their estimate. We do have in the unit description to 'avoid ash seedlings' which is fine, but not going to have them use hand tools to do so." (FP Ex 16) In response Antlitz wrote, "OK, just so they don't start to mow all the ash seedlings down. Our discussion out there was about what would be the most pragmatic way to go about it. A lot of the places the target species were such that sweeping in with a power tool didn't seem to make sense, but I guess it depends on how careful they are with the power tool. If he is asking to up the price a lot, that is understandable-just seemed to me given the situation that hand tools might actually go faster."(FP Ex. 17) Antlitz never instructed Shannon to use hand tools or even told him to hold up work until Showerman could get back to them.

16. O'Leary, who drafted the disciplinary notice at issue here was not familiar with the January 14, 2016 incident. (O'Leary, Tr.2 p. 70)

17. Antlitz revisited the site on January 22, 2016. She talked to a foreman "Bob". Shannon contacted Showerman by email. Bob had complained to Shannon that he was getting mixed messages which put a "damper" on the work. According to Bob it appeared that Antlitz was not happy about the removal of some elm trees and some of the ash trees. Antlitz was not included in the email chain. (FP Ex. 18) Showerman replied to Shannon that "doesn't sound like a problem based on your description and further told him to let him know if this continues to happen and he or Brenda will work to get a more consistent message out." (FP Ex. 20)

18. Showerman, at some point spoke to John McCabe and Chip O'Leary and then sent another email on January 27, 2016 to Shannon. He reiterated that he agreed with the contractor's decisions on the elms and indicated satisfaction with the project so far. (FP Ex. 21) He wrote in part, "The department overall does not agree with Debbie's assessment of how to deal with what is left of the ash population know(sic) that EAB has decimated everything." (FP Ex. 21) Antlitz was not included on this email train. No one asked Antlitz about what had happened in the field. Antlitz was not disciplined at that time for this incident.

19. Later that day, on January 27, 2016 O'Leary wrote to Antlitz and advised her that the contractor had called to get clarification. He instructed "if there are concerns to reach out to Troy …so we don't have these folks burning time unsure of next steps." (FP Ex. 22) Antlitz responded on the same day and asked "what was the clarification about." (FP Ex. 23) O'Leary did not respond. Two days later she wrote again to O'Leary, stating in part "follow up- I spoke to Troy yesterday.

According to Troy, the contractor asked for clarification on the removal of standing dead ash near a wetland. This was an item not on the original work order, which the contractor brought up and recommended doing when I was out there. I pointed out to the contractor that it was not part of the work order, but to talk to Contract Management about the suggestion. ..." (FP Ex. 23) O'Leary never told Antlitz in his email that her conduct was subject to discipline or constituted any form of infraction.

JANUARY 25, 2016 ANNUAL PERFORMANCE EVALUATION

20. On January 25, 2016 O'Leary met with Antlitz regarding her annual Performance Evaluation. Her overall rating was a "2.8" which indicates "meets some requirements." (FP Ex.24) This was a lower rating than she had received in prior years. She received low ratings in the areas of "professionalism", "communication", and "teamwork." (FP  Ex. 24)  O'Leary wrote that "Debbie struggles when it comes to professional disagreements and often crosses from reasonable disagreement to opposition which makes progress difficult."(FP Ex.24 p. 3)  During this meeting she was not told that any of her actions or behaviors were grounds for discipline. She did not receive written reprimands nor was placed on a performance plan.

21. Antlitz wrote some comments in the Employee Comment section of the review.  She wrote, "My "oppositions pertained to actions that were violations of Illinois Nature Preserve Plans, and the Illinois Endangered Species Act, such as the endangered species issue at Schaumburg Grassland, lack of IDNR consultation, and abiding by state approved Illinois Nature Preserve plans over which INPC has authority." (FP Ex. 24 p. 5)  She then signed the review.  O'Leary asked her to make a copy for her files.  Antlitz got up and as she left the room she "slid" O'Leary a copy of an email from an investigator in the Independent Inspector General's office. (O'Leary Tr.Pt.2, p. 100)  The email is dated November 13, 2015 and is seeking updated information from Antlitz.  The email referenced an inquiry previously initiated by Antlitz with specific criticism of O'Leary and the department. (Ant. Ex. 11)

22. When Antlitz returned to the room, she continued to ask O'Leary some questions about the site management plans.  He did not answer and terminated the meeting.  O'Leary testified he felt intimidated and threatened by Antlitz's conduct in showing him the document. (O'Leary Tr.Pt2, pps. 100-101)

THE BLUFF SPRING FEN NATURE PRESERVE PLAN

23. Antlitz spent a lot of her time and energy during 2015 drafting the Bluff Spring Fen Nature Preserve Plan. (Antilitz,Tr.2, p.295) This is a five year plan outlining the strategy to preserve the area, endangered plants and the wildlife within. The plan must be signed by the landowner (Forest Preserve); the stewardship group representing the Friends of the Fen and then approved by the Illinois Nature Preserves Commission. (Ant. Ex. 15) Steven Beyers had drafted the prior 2010 management plan.

24. On December 10, 2015 Antlitz sent out an email to Charles O'Leary as well as Steven Byers, Leon Halloran and Doug Taron who have interests in the Bluff Spring Fen but are not Forest Preserve employees. She attached the "nearly finished" plan to all recipients. (Ant.Ex. 13) Prior to this date there had been at least two earlier drafts sent to the same recipients.  In response, Stevens Byers wrote that he would look at the draft the following week.  Charles O'Leary replied to all on

email chain on December 18, 2015 "I will also want to review again. Will send on any comments. Chip." (Ant. Ex. 13)

25. Sometime prior to January 19, 2016, O'Leary annotated the draft with his comments and sent them only to Antlitz. (Ant. Ex. 15) O'Leary had both substantive comments and smaller corrections. In several comments he directed Antlitz to make certain corrections. Antlitz responded to O'Leary's comments with her own comments taking issue with many of his edits. Antlitz refused to make several corrections as instructed by O'Leary. In her response to O'Leary's comment "CH09" Antlitz provided a link to a 2012 public Independent Inspector General's report that criticized the academic qualifications of another district employee. (Ant. Ex. 18, p. 7) Although the employee was not named, O'Leary testified that it was clearly Laura Anchor and easily identifiable. On January 19, 2016 Antlitz, without consulting with O'Leary, sent the draft with the O'Leary comments and her responsive comments to everyone on the email chain including persons outside the Forest Preserve. (Antlitz Ex.14)

26. Sometime thereafter O'Leary withdrew the draft document and tabled discussions. (O'Leary Tr.Pt.2, p.160)

**Discussion**

The Employee Appeals Board conducts a *de novo* proceeding in which evidence is heard and findings are made. No deference is given to a department head's decision to discharge an employee. *Genius v. County of Cook*, 953 N.E.2d 407, 413 (2011); *Bono v. Chicago Transit Auth.*, 379 Ill App.3d 134, 882 N.E.2d 1242 2008 (1st Dist. 2008) It is the task of the Employee Appeals Board to determine if the District's decision to discharge is supported by the evidence of record and if so, if appropriate discipline was imposed.

According to the Cook County Personnel Rules, "all discipline shall be given only for just cause." 8.041 (c). In the context of a discharge, "good cause' is defined as:

a. Repetition of the same or similar infractions, or a combination of infractions of the Rules of Conduct for which there has been progressive disciplinary action. An employee who has been previously suspended may be subject to discharge for the next offense.
b. Commission of an infraction considered "Major Cause" as defined previously.
   Cook County Personnel Rules 8.43(f)(1)(a)(b)

Inherent to a finding of "good cause" is a determination that the employer's conduct in imposing the discipline was not arbitrary and capricious. *City of Springfield Illinois Police Department v. Springfield Police Benevolent and Protective Assn.*, 8 Pub.Employee Rep. for Illinois ¶ 4016 (App. 1992)

The Forest Preserve cites Antlitz for three different serious infractions, each of which it contends sustains the ultimate discipline of discharge. After approximately 24 years of employment with the District, the three alleged infractions occurred within six days of each other in January, 2016. It is uncontested that prior to 2012 Antlitz had never been disciplined. She was suspended for 3 days in 2012 for a "Major Cause" infraction. Each of the three infractions alleged herein will be discussed separately.

8

January 19, 2016

The District alleges that on January 19, 2016 Antlitz forwarded an email and annotated draft of a management resource plan to individuals outside of the district. The draft contained comments by O'Leary that he said were directed only to Antlitz. Antlitz failed to follow his instructions as to certain corrections in the document and included her own comments often in opposition to O'Leary's suggestions. She also provided an internet link to a 2012 Inspector General Report that criticized the credentials of a different district employee. While the report did not name the employee, O'Leary and McCabe testified that it was obvious that the report referred to a Laura Anchor, an individual that Antlitz had previously harassed. They both testified that the link to the Inspector General report could harm the reputation of the District as well as the individual. Ms. Anchor did not testify at the hearing. O'Leary testified that he was surprised and embarrassed that Antlitz sent the document outside of the district. He testified it was inappropriate and harmful to the district. (O'Leary Tr.2, p.81) When questioned, O'Leary did not know of any specific harmful repercussions as a result of Antilitz' actions. He decided to pull the draft and rethink it later. Antlitz was not immediately disciplined for her January 19, 2016 conduct.

Prior to January 19, 2016, there had been previous drafts of this document that had been sent to O'Leary as well as interested parties outside of the District. O'Leary never told Antlitz not to send the document to the outsiders, and in fact at an earlier time, he sent a "reply" to all parties (including those not District employees) that his comments would be forthcoming. When O'Leary sent his comments to Antlitz he did not tell her it was confidential or that it could not be shared with the outside partners. Antlitz contends that this exchange of comments is part of a well-established collaborative approach that is necessary to the overall protection of the nature areas. She testified that she has worked for years to develop these relationships and that she was afraid that implementing O'Leary's edits would jeopardize the coalition. She testified that the document was late, it should have been filed and approved in the end of 2015 and she was trying to facilitate closure. She claimed that it was difficult to obtain responses from O'Leary and that she felt that she was not respected. She did not have a clear answer as to why she included the link regarding Anchor and her testimony that she did not know for sure that it was Anchor was not credible.

The ALJ finds that Antlitz exhibited poor judgment and failed to follow instructions in sending this draft with the O'Leary comments and her responses outside the District. At a minimum she should have consulted with O'Leary. While Antlitz and O'Leary may have very different ideas about the collaborative process, Antlitz reports to O'Leary who has the final say in the verbiage of the document and the drafting process. The inclusion of the link about Anchor while troubling and perhaps immature, did not name the party and was derived from a public document that is available on the internet. Despite the District's repeated assertions of Antlitz'ss intentional animus, there is no evidence that she was motivated by a desire to harm or embarrass O'Leary or the District. She appeared to be motivated, if not driven, by a mission to finish the plan, and to take any and all steps she believed were necessary to sustain the coalition and thereby protect the resources. However, in her drive she ignored her obligations, responsibilities and role as an employee within the District. She knew or should have known given her long tenure in the District that it was not appropriate to publish the comments and her responses without approval.

The District has sustained its burden of showing that it had good cause to discipline Antlitz for her conduct pursuant to rule 8.03(c)(2). "Fail to follow instructions or fail to work in accordance with County Policies, procedures and/or practices", 8.02(c)(1) "Misuse of confidential or proprietary information....including department files, documents or data" and 8.03(c)(14) "perform at less than a satisfactory level in any job classification". The District has not sustained its burden of showing that it had good cause to discipline Antlitz for violation of Rule 8.03 (b)(3) "(major cause) Fighting or Disruptive Behavior". Her conduct while disturbing to O'Leary and McCabe, and clearly inappropriate, was not akin to "physical fighting or disruptive behavior". "Disruptive behavior" is not defined in the Cook County Rules and Regulations. Since any infraction, misbehavior or negligent conduct could arguably be labeled as "disruptive", the specific language of 8.03(b)(3) must be read in the context of a "major cause" infraction. For disruptive conduct to qualify as a major cause infraction it must be more than an embarrassment, inconvenience or even irritation. Neither Halloran nor Beyers testified to any unusual reaction to the receipt of the document. O'Leary did not testify as to any specific adverse feedback from any recipient.

The District has noted that it in making the decision to terminate it considered the fact that Antlitz had been cautioned against including outsiders in District correspondence in late 2015. (FP Ex. 26) While the context was a little different, the message was clear. The district did not want Antlitz or any employee to disclose internal conflicts until it had a chance to resolve issues within the District.

Since Antlitz did not commit a "major cause" violation, she was entitled to progressive discipline. Given her lengthy tenure with the district and the absence of prior discipline relating to this type of conduct, immediate termination was not appropriate. While she had never been formally disciplined for this type of behavior she had been counselled via email in December, 2014. (FP Ex. 26) The Administrative Law Judge finds that Antlitz should not have been discharged for this infraction but should have received the lesser discipline of a 29 day suspension with an admonishment that any further conduct of this sort can result in termination.


January 22, 2016

The Forest Preserve alleges that Antlitz created confusion in her interactions with a contractor working for the district. The Forest Preserve contends that although Antlitz was given clear instruction on the work to be done, she created confusion by giving the contractor contradictory information to the District's instruction. As a result the District contends the work came to a halt and created an unscheduled shift in the work to be performed.

As part of her job duties as an Ecologist II, Antlitz was involved in the drafting of a work order for the Busse Forest South area. During the end of 2015 she had several email conversations with Troy Showerman regarding whether the District should protect ash seedlings and saplings. Antlitz wanted to include a provision in the work order that gave protection to the Ash as well as other native growth. Showerman countered that due to the bore infestation it did not make sense to spend money to protect any Ash trees at that time. As a sort of compromise the final work order contained instructions "to avoid ash seedlings". According to Showerman, this is a lesser form of protection, one that should not cost the District extra funds but would provide some protection. (Showerman, Tr.1, p.63) Showerman

10

testified that he wasn't pleased with the "push back" from Antlitz and that he felt frustration dealing with her regarding issues that he felt were clear. (Showerman, Tr.1, p. 34)

After the contract commenced, Antlitz was asked by Showerman or his staff to review the work site and check on the ongoing work. This was not an unusual request. Antlitz testified that when she arrives at a work site, she is often questioned by the contractor or the foreman as to the ongoing work. There are often questions as to the trees to be cut, or the undergrowth to be removed. (Antlitz Tr.2, p. 324 ) As an experienced ecologist, Antlitz is qualified to have these discussions. She is not authorized, however, to make any changes to the work order. She is instructed to have the contractor contact Showerman or a member of his staff if he has concerns regarding the scope of the work order. According to the emails in evidence, after a walk through on January 22, 2016 "Bob", the foreman, told his boss, John Shannon that the crew was upset about some of the comments and criticisms made by Antlitz about elimination of elm trees and other issues. Neither Bob nor Shannon testified at the hearing. [5] There is no evidence of record that work was stopped or that Antlitz's comments or criticisms caused any financial loss to the District. There were, however, a few extra email communications and perhaps some time spent reassuring Shannon that his team was doing a good job and insuring that the work was proceeding in an efficient and environmentally sound manner.

There was a lot of testimony by the District regarding Antlitz's alleged refusal to accept the District's policy on the protection of ash. The record supports that the work order dictated some degree of protection for ash and it was not inappropriate for Antlitz to carefully review the work site and make suggestions as to how to best protect the species within the parameters of the work order and without incurring additional costs. When she discussed the use of hand tools rather than power tools, she backed off when told that it was not feasible. The record shows that Antlitz is a strong advocate for the preserve and that she pushes as hard as she can to assert her perspective or strategy. Perhaps the contractor or his team interpreted this zealousness as a lack of supportive or positive feedback. There is no evidence of inappropriate verbiage or belligerence towards the contractor or his staff. [6] According to Antlitz, on this occasion she was asked about an ash tree that was not included in the work order. She instructed the contractor to contact Showerman which he did. When Shannon complained about Antlitz, no one contacted Antlitz to find out her side of the story. There was no investigation. Showerman, O'Leary and McCabe assumed that she acted inappropriately. Antlitz was not included on the emails from the contractor so she had no information as to the nature of the concerns. When she asked O'Leary to clarify, he didn't respond, so she contacted Showerman for information. Antlitz was not promptly disciplined for this conduct in January, 2016.

The District has not sustained its burden of proving good cause regarding this alleged infraction. Even the decision maker, McCabe, testified that this alleged violation standing alone would not justify termination. (McCabe, Tr.2, p. 184) There is insufficient evidence of record to support a violation

---

[5] The contractor was Tall Grass Restoration LLC, a company Showerman had worked for immediately before coming to the District. (Showerman Tr.1 p.55)

[6] The Forest Preserve's argument that this is the same conduct that resulted in a three day suspension in 2012 is not persuasive. In 2012 Antlitz was disciplined for inappropriate, unprofessional behavior while working with a hired contractor which led to work being shut down for a half day and additional costs being incurred by the District. She was also cited for making threatening statements in regard to a different project and making disparaging remarks directed toward other district staff involved in the project. (F.P. Ex. 1) As stated above, the conduct reported herein, while involving a contractor, does not include the same objectionable elements.

pursuant to rule 8.03(b)(3); 8.03 (c)(2) and/or 8.03(c)(14). There is insufficient factual support in the record for any discipline to be imposed as a result of this incident.

January 25, 2016

The Forest Preserve alleges that at the conclusion of her annual performance review, Antlitz handed, unsolicited a copy of an email exchange between an investigator of the office of the Independent Inspector General and herself identifying the Resource Management Department and her supervisor (Charles O'Leary) as the subjects of a possible investigation. The Forest Preserve claims that the email was unrelated to the review and was seen as an attempt to harass and intimidation Mr. O'Leary.

According to Antlitz, at the end of the review which she felt had not gone well, she told O'Leary that she needed some additional information from him regarding a management plan for Schaumberg Grasslands. (Antlitz Tr.2,pps. 359-61) She testified that she rarely had occasion to meet with O'Leary so she wanted to take the opportunity to get additional information she needed. She testified that she first asked questions and when he wouldn't answer, she gave him the document as she was leaving the room to make a copy of her appraisal. O'Leary testified that she "slid" the document at him. When she came back into the room, she continued to ask for information but O'Leary terminated the meeting due to the intimidation he felt.

This interchange is indicative of the toxic nature of this employment relationship. The animosity and lack of trust and respect between the employee and her managers and visa versa was palpable during the hearing. It is impossible to know who was responsible for the decline of this relationship which deteriorated after the change in management approximately four years before the termination. While Antlitz is an experienced and competent ecologist she is not an easy or compliant employee. She lacks communication skills and respect for boundaries within the work place. Management, on the other hand appears unable or unwilling to include her in the team and is aggressively seeking to terminate her employment. Given this charged environment it is difficult to assess credibility. Everyone appears to have an agenda. As to the act of "sliding" the email towards O'Leary, the ALJ finds that it was an immature and unprofessional act of a frustrated employee. Similarly, O'Leary's testimony regarding the "intimidation" he felt was an overly emotional and exaggerated reaction from a frustrated manager. Dealing with difficult employees and responding to departmental investigations is part of a supervisor's job responsibilities. The fact that Antlitz initiated the complaint or showed O'Leary a copy of the email is not an actionable offense nor should it considered an act of intimidation. Rather than terminating the meeting, O'Leary could have asked Antlitz to sit down and explain the document. Antlitz in turn should have been willing to provide substantive responses to O'Leary's inquiries. To discipline Antlitz for initiating a complaint or investigation is arguably retaliatory. The Forest Preserve has not sustained its burden of proving "just cause" to discipline Antlitz pursuant to Rule 8.03(b)(3) and/or 8.03(c)(11). No discipline is merited.

**Conclusion:**

Based on the entire record, testimony and documents, for the reasons cited above, as well as the length of Antlitz's service and the absence of meaningful progressive discipline, the ALJ finds that

the District did not have good cause to terminate Antlitz and that she should be reinstated to her former position, subject to a 29 day suspension.

/s/  Joanne Kinoy
Administrative Law Judge
Cook County Department of Administrative Hearings

October 3, 2016

13